**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**JERRELL JACKSON,**<br><br>**Defendant.** | **Case No. 26-cr-269-CRC** |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION FOR DEFENDANT JERRELL JACKSON

The United States of America, by and through its attorney, the United States for the District of Columbia, respectfully submits this memorandum in support of its motion that defendant Jerrell Jackson (hereinafter, "DEFENDANT") be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(E) (Firearm/Other Dangerous Weapon) of the Bail Reform Act.

This case involves an extraordinary display of armed violence that endangered civilians and National Guard soldiers alike. DEFENDANT'S conduct demonstrated not only his willingness to resort to gunfire during a confrontation but also his willingness to continue the violence despite the intervention of uniformed National Guard soldiers. No combination or combination of conditions of release can reasonably assure the safety of the community.

On November 13, 2026, the Grand Jury for the District of Columbia returned a three-count indictment charging DEFENDANT with 1) 18 U.S.C. § 922(g)(1) (unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year); 2) 22 D.C. Code § 402 (assault with a dangerous weapon); and 3) 22 D.C. Code § 4404(b) (possession of a firearm during a crime of violence or dangerous offense). Dkt. # 9. The facts of this case confirm that detention is not just warranted, but necessary to protect the

community.

On October 18, 2026, DEFENDANT opened fire towards a group of individuals outside of a busy nightclub during a fight that he instigated. When the individuals attempted to flee, DEFENDANT fired his pistol in the direction of one individual—Jane Doe— as she sought shelter in a door alcove. At that point, National Guard soldiers attempted to intervene and directed DEFENDANT to drop his firearm. Instead of complying, DEFENDANT turned his weapon on the Guardsmen and fired his pistol in their direction as he fled into an alley. DEFENDANT then engaged in a firefight with the Guardsmen wherein he fled down an alleyway, took cover behind a parked vehicle, and fired his pistol two more times—a weapon he is prohibited by law from possessing—before he dropped to the ground and surrendered. DEFENDANT took these actions after previously being convicted in a D.C. Superior Court case for nearly identical conduct—shooting at a uniformed special police officer after engaging in a fight. DEFENDANT was still on supervised release for this conviction when he discharged his firearm on October 18.

DEFENDANT'S actions on October 18, 2026, and his willingness to employ deadly force against the community and military personnel underscores the extreme danger he poses to the community at large. This was not simply unlawful firearm possession. It was a succession of deliberate, dangerous acts in which opportunities to stop the violence were met with further gunfire. DEFENDANT's alleged conduct, particularly his decision to fire in the direction of uniformed soldiers who attempted to stop the shooting, underscores the grave danger his release would pose to the community.

Considering the factors specified under 18 U.S.C. § 3142(g), there is no condition or combination of conditions that will reasonably assure DEFENDANT's appearance in court and the safety of any other person and the community. Accordingly, DEFENDANT should be ordered

detained pending trial.

## BACKGROUND

On October 18, 2026, at approximately 23:12 hours, ShotSpotter detected the sound of approximately nine gunshots in the vicinity of 418 8th Street SE, Washington, D.C. Additionally, at 23:14 hours, the Office of Unified Communications received a call for service regarding a shooting at 424 8th Street SE, Washington, D.C. Metropolitan Police Department Officers were dispatched to Café 8, located at 424 8th Street SE. Law enforcement learned that a physical altercation had occurred on the sidewalk in front of Café 8 between a group of individuals. Law enforcement further learned that members of the National Guard were parked in a van in front of Café 8 when the altercation occurred and attempted to break up this fight. As the National Guardsmen exited their van, they heard the sound of several gunshots and observed one of the individuals involved in the altercation (who was subsequently identified as DEFENDANT) with a firearm. One of the National Guardsmen ordered DEFENDANT to drop the weapon, but DEFENDANT did not comply. A National Guardsman then discharged his firearm as DEFENDANT began to run down an alleyway. As DEFENDANT fled, DEFENDANT discharged his firearm in the direction of the National Guardsmen, prompting further gunfire during which DEFENDANT was struck. After DEFENDANT was struck by gunfire, he tossed his firearm and lay face down on the ground. DEFENDANT was detained by law enforcement and transported to an area hospital for medical treatment for a gunshot wound to the abdomen. Following the gunfight, one of the Guardsmen reported that he had been hit in the right leg by gunfire.

Investigators recovered surveillance video from several cameras in the vicinity of Café 8 which captured the shooting. This video is in color and does not contain audio. Law enforcement conducted a preliminary review of this surveillance video and the following was learned.

Law enforcement recovered surveillance video from a camera located on the front of Café 8. That camera, named Front-1, is situated on the exterior of the establishment and faces north. At timestamp 23:11:27, the video captured a group of individuals congregated in front of Café 8. At 23:11:31, DEFENDANT is visible exiting Café 8. At 23:11:37, DEFENDANT is visible walking northbound away from Café 8.




*Figure 1*

At approximately 23:11:44, DEFENDANT then circled back to Café 8 with his hand positioned in front of his body.




*Figure 2*

A group of individuals then approached DEFENDANT and a physical altercation occurred.




*Figure 3*

At approximately 23:12:05 a member of the National Guard exited the front passenger door of a van parked nearby.



*Figure 4*

At timestamp 23:12:03, the altercation abruptly dispersed and the group involved in the altercation, as well as individuals in front of the club scattered, consistent with a gunshot having been fired.

Surveillance video recovered from a business across the street captured the altercation and what appeared to be the first gunshot that was fired during the altercation. This video is in color but does not have sound. At timestamp 23:12:05 smoke consistent with a gunshot having been fired is captured by the camera.



*Figure 5*

Immediately afterwards, the individuals involved in the altercation scattered, as did the group of individuals standing in front of Café 8.



*Figure 6*

Surveillance video recovered from Café 8 camera Front-4 also captured the incident. At timestamp 23:12:00 DEFENDANT is involved in the altercation with the group of individuals.




*Figure 7*

At timestamp 23:12:04, the individuals involved in the altercation scattered in a manner consistent with a gunshot having been fired. One of the individuals involved in the altercation, Jane Doe, ran to the front door of the smoke shop next door to Café 8.




*Figure 8*

At timestamp 23:12:05, DEFENDANT appeared to run after the individual who ran towards the smoke shop. DEFENDANT appeared to be holding an L-shaped object in his right hand that is consistent with a firearm.




*Figure 9*

At timestamp 23:12:06, DEFENDANT, as he ran past the entrance to the smoke shop, raised his right hand and appeared to discharge the firearm he is holding towards the area where Jane Doe was standing. Law enforcement subsequently obtained a bullet fragment from an employee who had recovered the fragment from the entrance of the smoke shop.




*Figure 10*

At time stamp 23:12:07, DEFENDANT, still holding the firearm, ran past another individual standing on the sidewalk and into an alleyway.




Figure 11

Approximately a second later a member of the National Guard appeared to discharge their service weapon in the direction of DEFENDANT.




*Figure 12*

Video was recovered from a location which was facing the sidewalk of 8th Street, near the alleyway. This video had sound. The time stamp is off by approximately one hour. The following screenshot captured DEFENDANT running into the alleyway at approximately 23:12:12 while he appeared to fire his pistol back in the direction of the National Guardsmen and other individuals. A muzzle flash is visible. The boots and lower half of two National Guardsmen are visible to the upper right area of the screenshot.




*Figure 13*

Law enforcement also recovered surveillance video from a Café 8 camera named Side Front that captured the alleyway DEFENDANT ran down during the incident. While still holding the firearm, DEFENDANT ran down the alleyway towards a light-colored Subaru. When DEFENDANT reached the rear of the vehicle, he stopped, turned around, and pointed the firearm in the direction of the National Guardsmen.




*Figure 14*

DEFENDANT then ducked behind the vehicle, before laying on the ground face down with his hands above his head.

Surveillance video of the alleyway from earlier in the evening showed when the Subaru parked in the alleyway around 23:05:59 and DEFENDANT exited the vehicle from the front passenger seat.



*Figure 15*

Law enforcement subsequently recovered a firearm from underneath the Subaru. The recovered firearm was a Taurus G2C 9mm pistol. At the time the firearm was recovered, it was loaded with round in the chamber and one round in a magazine with a 12-round capacity.



*Figure 16*

In addition to the firearm, law enforcement recovered three cartridge casings on the ground in the alley south of 414 8th Street SE. These three cartridge cases had headstamps marked with "MaxxTech." The two cartridges loaded in the Taurus firearm recovered by law enforcement had headstamps marked with "MaxxTech."

## **ARGUMENT**

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e). When determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by release. *See* 18 U.S.C. § 3142(g).

In making the pretrial detention determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device. *See Smith*, 79 F.3d at 1210 and *Williams*, 798 F. Supp. at 36.

The Government seeks detention pursuant to 18 U.S.C. § 3142(f)(1)(E) (felony involving possession of a firearm). The facts and circumstances in this case demonstrate that there are no conditions or combination of conditions that would assure the safety of the community or DEFENDANT's return to Court should he be released. *See* 18 U.S.C. § 3142(e)(1). Here, all four of the § 3142(g) factors favor detention pending trial, including: (1) the nature and circumstances

of the offense charged; (2) the weight of the evidence against DEFENDANT; (3) DEFENDANT's history and characteristics and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.

**1. § 3142(g)(1)- The Nature and Circumstances of the Offenses Charged Weigh in Favor of Detention.**

The evidence outlined above shows that DEFENDANT possessed a pistol on October 18, 2026. DEFENDANT, however, was prohibited from possessing any firearm on that date by virtue of his convictions in D.C. Superior Court in case numbers 2014 CF3 013717 and 2009 CF2 010829. In each of those cases, DEFENDANT received a sentence of greater than one year imprisonment.

But DEFENDANT did not stop there. DEFENDANT took the pistol to a crowded club on October 18, where he started a fight on the street with club goers and made the decision to fire multiple rounds at individuals who were in front of the club that night. His conduct endangered not only the individuals at whom he fired, but also the numerous innocent bystanders in the vicinity.

Even when the National Guardsmen told DEFENDANT to stop and drop his pistol, DEFENDANT tripled down on his night of bad decisions and fired at the Guardsmen. This time, firing at the very individuals who attempted to stop the violence.

This was not a single impulsive act or an isolated instance of unlawful firearm possession. DEFENDANT made a series of increasingly dangerous decisions: bringing a firearm to a crowded nightclub, initiating a confrontation, discharging multiple rounds in a public area, and ultimately firing at National Guardsmen who ordered him to disarm. At each successive opportunity to disengage, DEFENDANT chose to escalate the violence.

The nature and circumstances of these offenses demonstrate an extraordinary disregard for the safety of others and a willingness to resort to gunfire even in the presence of armed National Guardsmen. That conduct raises grave concerns about the danger DEFENDANT would pose if released into the community. Consequently, the first § 3142(g) factor—nature and circumstances of the offenses charged—weigh firmly in favor of detaining DEFENDANT pretrial.

**2. § 3142(g)(2)- The Weight of the Evidence Against DEFENDANT Supports Detention.**

The evidence against DEFENDANT is overwhelming. DEFENDANT's actions on October 18, 2026, inside and outside Café 8, were almost entirely captured on video. Except for moments inside Café 8, we have video which documented a moment-by-moment timeline of the events on October 18. And critically, the government's evidence is not limited to video footage: the firearm DEFENDANT discharged was recovered.

Video captured DEFENDANT arriving in and exiting from a Subaru which had parked in an alley near Café 8. Video showed DEFENDANT entering Café 8 and subsequently leaving the club. Video then captured DEFENDANT outside Café 8, prior to his fighting with club goers, where he appeared to aggressively manipulate or grip a pistol in his waist area. Recorded video captured DEFENDANT fighting with club goers and appearing to draw and fire a pistol. Still more video captured DEFENDANT running while firing his pistol towards an individual seeking cover near the front door of a neighboring business.

Most significantly, the video captured DEFENDANT discarding his pistol beneath the very Subaru in which he arrived. Law enforcement subsequently recovered a firearm from beneath that vehicle. Thus, the government possesses not merely surveillance footage, depicting DEFENDANT's possession, discharge, and disposal of a firearm, but also the physical firearm

recovered from the location where the video showed him discarding it.

The significance of that recovery cannot be overstated. The video evidence traced DEFENDANT's movements, captured his repeated use of the pistol, and documented precisely where he discarded it. The subsequent recovery of the firearm corroborates the evidence and provides powerful physical confirmation of DEFENDANT's possession of a gun.

Simply put, the evidence against DEFENDANT is strong, documenting in vivid detail his conduct on October 18. The second § 3142(g) factor therefore falls squarely in favor of detention.

**3. § 3142(g)(3)- DEFENDANT's History and Characteristics Compels Detention.**

DEFENDANT's criminal history demonstrates that the violent conduct charged in this case is not an isolated incident, but part of a troubling pattern of firearm-related offenses and violence. Despite multiple felony convictions, a substantial period of incarceration, and the restrictions of supervised release, DEFENDANT continues to engage in conduct that places the community at serious risk.

In 2015, a D.C. jury convicted DEFENDANT of numerous felony charges in Superior Court case 2014 CF3 013717. Among the charges, DEFENDANT was convicted of threatening to injury or kidnap a person, assault on a police officer while armed, assault with a dangerous weapon, and unlawful possession of a firearm. According to the judgment in that case, DEFENDANT was sentenced to a total of 120 months imprisonment, with a mandatory minimum term of 72 months.

Particularly significant is the striking similarity between DEFENDANT's prior convictions and his present conduct. DEFENDANT was previously convicted of assaulting a uniformed special police officer while armed and unlawfully possessing a firearm. Yet, on October 18, 2026, he allegedly once again possessed a firearm and escalated a confrontation into gunfire, ultimately

firing toward pursuing National Guardsmen. DEFENDANT's prior convictions and lengthy prison sentence plainly did not deter him from engaging in the very type of dangerous conduct for which he has previously been punished.

Even more troubling, DEFENDANT was on supervised release for his 2015 conviction when he committed the instant offenses. Thus, DEFENDANT's alleged conduct occurred while he was already subject to court-imposed supervision. The fact that he allegedly engaged in such brazen and dangerous conduct while under supervision raises serious doubts about whether any additional conditions of release could reasonably assure the safety of the community.

Nor was the 2015 conviction DEFENDANT's first firearm offense. In 2010, a D.C. jury convicted DEFENDANT of unlawful possession of a firearm in Superior Court case 2009 CF2 010829. DEFENDANT was subsequently sentenced to 33 months imprisonment on that case. Finally, in 2006, DEFENDANT pleaded guilty to carrying a pistol without a license in Superior Court case 04FEL7164.

The choices DEFENDANT made on October 18, 2026, could have easily concluded with the murder of a club goer outside Café 8. DEFENDANT's actions showed a callous disregard for the community by firing off rounds in the direction of community members and National Guardsmen. DEFENDANT's prior convictions show that this is not an isolated act, but rather another act of violence. For these reasons, the third § 3142(g) factor— DEFENDANT's history and characteristics—necessitate his pretrial detention.

4. **§ 3142(g)(4)- The Nature and Seriousness of the Danger to Any Person or the Community That Would be Posed by DEFENDANT's Release Requires Detention.**

The final factor which the Court must consider in weighing whether DEFENDANT should

be detained pending trial is § 3142(g)(4), the nature and seriousness of the danger to any person or the community that would be posed by DEFENDANT's release. § 3142(g)(4) "'encompasses much of the analysis set forth above, but it is broader in scope,' as it requires the Court to engage in an 'open-ended assessment of the 'seriousness' of the risk to public safety.'" *United States v. Klein*, 533 F. Supp. 3d 1, 17 (D.D.C. 2021). The facts and evidence documented in this memo highlight the serious risk DEFENDANT presents to public safety should he be released.

First, DEFENDANT's actions on October 18 were deliberate and intentional. The video evidence showed that DEFENDANT entered Café 8 and after being told to leave, DEFENDANT remained on the street to the front of the club where he appeared to aggressively posture and grip at his waist area. Then, DEFENDANT fought with club goers and fired a pistol; a pistol which DEFENDANT is not permitted to possess. DEFENDANT then ran from the area and fired another shot towards Jane Doe who was near the front door of a neighboring business and finally DEFENDANT fired shots towards the direction of pursuing National Guardsmen.

Second, DEFENDANT's conduct on October 18 is not an isolated incident. DEFENDANT is 41 years old, and at this point in his life he should not be fighting and shooting in front of D.C. clubs. As if DEFENDANT's gross lack of judgment in this incident were not compelling enough, in 2015 DEFENDANT was convicted of similar, violent conduct. According to the police report in that case, a uniformed special police officer saw that t DEFENDANT appeared to want to get into a physical fight with another individual. The special police officer and DEFENDANT exchanged words, and DEFENDANT temporarily left the area. DEFENDANT subsequently returned and discharged a firearm at the uniformed special police officer. DEFENDANT was on supervised release for that crime when he again discharged a firearm in public on October 18, 2026.

DEFENDANT's conduct on October 18, 2026, coupled with his previous convictions, paints a picture of a violent individual who, even at 41 years of age, does not seem to be maturing. DEFENDANT is a dangerous individual, and consequently the fourth § 3142(g) factor weighs firmly in favor of detention.

## CONCLUSION

In light of the facts presented above, the United States respectfully requests that DEFENDANT be detained pending trial in this matter.

Respectfully submitted this 18th day of November 2026.

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: */s/ Matthew P. Mattis*_____
Matthew P. Mattis
Benjamin Helfand
California Bar No. 225047 (Mattis)
D.C. Bar No. 1658708 (Helfand)
Assistant United States Attorneys
601 D Street N.W.
Washington, D.C. 20004
(202) 252-0847
matthew.mattis@usdoj.gov